IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION


UNITED STATES OF AMERICA     )
                             )
     v.                      )  CRIM. ACTION NO.
                             )    3:94cr25-T
JAMES LEE TRAMMELL, JR.      )       (WO)


ORDER

In 1994, defendant James Lee Trammell, Jr. was convicted
and sentenced for drug trafficking and conspiracy, as well
as several firearms charges. His sentences for the
trafficking and conspiracy counts were later vacated on a
§ 2255 motion. Trammell is now due to be resentenced.
Before the court are several disputed Sentencing Guidelines
issues that must be resolved prior to resentencing.

## I. Background [1]

On February 24, 1994, Trammell and 14 co-defendants were charged with violations of the Controlled Substances Act in a 28-count superceding indictment.  Count 1 charged Trammell and his co-defendants with conspiracy to distribute and possess with intent to distribute cocaine base; counts 2 through 27 charged various firearm violations and drug trafficking offenses; and count 28 sought the forfeiture of interest in certain real and personal property.  The counts specific to Trammell are as follows.  Counts 2 through 4 charged Trammell with various firearms offenses; count 18 charged Trammell with knowingly and intentionally distributing 4.544 grams of cocaine base on July 20, 1993; and count 24 charged Trammell with knowingly and

_____

1.    In 2000, this court resentenced several of Trammell's co-defendants, Nelson Nikitha Fears, Morris Ramsey, Ossie Orlando McCauley III, and JaJa Zambrowski Davis.  Thus, the court will rely heavily on its previously-issued order (Doc. No. 815) for the purposes of recounting background information about the offenses.  For later history of this case, see United States v. McCauley, 2001 WL 34075508 (M.D. Ala. 2001), aff'd, United States v. Davis, 329 F.3d 1250 (11th Cir.), cert. denied, 540 U.S. 925, 124 S.Ct. 330 (2003).

intentionally distributing 4.712 grams of cocaine base on September 22, 1993.

The charges stemmed from drug-distribution activities in West Shawmut, a small, densely populated community located in the southwest part of Lanett, Alabama.  During the period of the conspiracy, the defendants conducted an open-air drug market in two West Shawmut areas called the "Hole" and the "Dope Zone."

Law enforcement personnel, with the assistance of confidential informants, made controlled buys of crack from drug traffickers in the West Shawmut community.  Three or more confidential informants assisted law enforcement in making the controlled buys.  Together, they assisted in making approximately 16 controlled buys over approximately six months.

The evidence at trial demonstrated a loosely formed hierarchical conspiracy.  Level-one "runners" were typically crack cocaine addicts who sold $20 rocks on the streets or took customers who wanted to make purchases for larger

amounts to level-two dealers.  Runners were typically paid with crack or small amounts of money for their efforts. Level-two, or mid-level, dealers sold one-eighth, one-quarter, and one-half ounces of crack cocaine.  They employed these runners and also supplied the runners with small quantities of crack cocaine to sell.  These level-two dealers relied upon level-three dealers--those who sold a minimum quantity of an ounce (roughly 28 grams) of crack or more--for their supply of crack.

The government's theory of the case at trial was that Trammell was at least a level-three dealer who dealt only in larger amounts from his residence.  During the government's case-in-chief, confidential informant Nichael Welch testified that he purchased crack from Trammell at his residence on two occasions, in amounts that were later determined to be 4.544 and 4.712 grams.[2]  In addition, evidence was presented indicating that a search warrant was conducted on Trammell's home on January 28, 1994, producing,

_____

2.  Trial transcript of April 5, 1994, pp. 23, 100-101.

4

among other things, ammunition, a set of electronic scales, and a hard off-white rock substance.[3]

Trammell was convicted of conspiracy (Count 1), the weapons charges (Counts 2, 3, and 4) and one of the two distribution charges (Count 24).  He was acquitted on the other distribution charge (Count 18).

On June 23, 1994, United States District Judge Robert E. Varner found that Trammell was accountable for at least 500 grams but less than 1.5 kilograms of cocaine base, but did not base this decision on any individualized findings.[4]  He then sentenced Trammell to a mandatory term of life

_____

3.  Trial transcript of March 31, 1994, pp. 100-102. However, despite testimony at trial that drugs were found during the search of Trammell's home, neither the drugs themselves, nor any information about the drugs, were ever introduced into evidence at trial.  Courtroom deputy minutes (Doc. No. 398), exhibit list.

4.  In determining the drug quantity attributable to Trammell, the court simply stated, "I have already announced, I think, that I think it's reasonable to assume or to decide by a preponderance of the evidence that because they were conspirators that the amount involved was at least one hundred and fifty grams and not more than five hundred." Sentencing transcript, June 23, 1994, p. 7.

imprisonment on the conspiracy count (Count 1),[5] a term of 293 months' imprisonment on the drug distribution conviction (Count 24), and terms of 60 months' imprisonment for each of the gun-possession offenses (Counts 2-4), to run concurrently.

After the Eleventh Circuit affirmed his convictions and sentences, United States v. Trammell, 107 F.3d 23 (11th Cir. 1997), and after the case was reassigned from Judge Varner to the undersigned, Trammell filed a petition pursuant to 28 U.S.C.A. § 2255 on May 29, 2001, alleging, among other things, that his counsel was ineffective for failing to challenge on appeal the quantity of cocaine attributable to him for sentencing purposes, and for failing to challenge the timeliness of the government's notice of its intent to rely upon prior felony drug convictions for enhancement

---

5. Judge Varner concluded that a life sentence was mandatory on the conspiracy count pursuant to 21 U.S.C.A. § 841(b)(1)(A) because the conspiracy involved at least 50 grams of cocaine base and because Trammell had two prior felony drug convictions.

purposes.[6]  The magistrate judge agreed with both of those
arguments and recommended that the district court vacate
Trammell's sentences on the conspiracy and distribution
counts (Counts 1 and 24).  This court then issued an opinion
adopting the report and recommendation.[7]

At Trammell's resentencing hearing on January 31, 2005,
this court identified four factual and legal issues in
dispute that must be resolved before he can be resentenced:
(1) the quantity of drugs attributable to Trammell for
sentencing purposes; (2) whether Trammell is subject to a
two-level firearm enhancement pursuant to U.S.S.G.
§ 2D1.1(b)(1);[8] (3) whether Trammell is subject to a three-

---

6.  Judge Varner is now on senior status and is
disabled.

7.  <u>United States v. Trammell</u>, civil action no.,
3:01cv658-T (Doc. No. 49).  The court did not vacate the 60-
month sentences imposed for each of Trammell's three gun-
possession offenses; thus, these sentences remain
undisturbed upon resentencing.

8.  In his § 2255 petition, Trammell argued that his
counsel was ineffective for failing to challenge the trial
court's application of the two-level enhancement of his base
offense level for co-conspirator possession of a firearm.
(continued...)

level 'supervisory role' enhancement pursuant to U.S.S.G.

§ 3B1.1(b);[9] and (4) whether the sentences imposed should run

consecutively or concurrently.[10]

_____

8.   (...continued)
That argument was rejected by both the magistrate judge and
this court.  See United States v. Trammell, civil action no.
3:01cv658-T (Doc. No. 47), pp. 10-13.  However, Trammell's
sentences for drug conspiracy and distribution have been
vacated in their entirety and must be re-calculated anew.
Trammell objects to the application of the firearm
enhancement in the re-calculation of his sentence.
Therefore, the court must again address the application of
the enhancement.

9.   The government is arguing for the first time that
this enhancement applies.  The fact that the government did
not make this argument at Trammell's original sentencing
does not preclude it from making it here.  When a criminal
sentence is vacated, it becomes void in its entirety and the
slate is wiped clean.  United States v. Stinson, 97 F.3d
466, 469 (11th Cir. 1996).  Thus, the court may approach
Trammell's re-sentencing as if it were sentencing him for
the first time.

10.   The court also notes that the government concedes
that the notice of its intent to seek a sentencing
enhancement based on Trammell's prior felony convictions
pursuant to 21 U.S.C.A. § 851(a)(1) was untimely and was
therefore applied in error.  The government further concedes
that the sentencing enhancement should not be used in re-
calculating Trammell's sentence.  Brief in Support of
Government's Position Regarding Resentencing (Doc. No. 979),
p. 7.

At that same hearing, the court heard testimony from Stanley Quincey Johnson, a co-defendant of Trammell's who later received a drastically reduced sentence in exchange for cooperating with the government.  The court also heard the testimony of Robert Chambers of the Alabama Alcoholic Beverage Control Board and Michael Dixon of  the Alabama Bureau of Alcohol, Tobacco and Firearms, both of whom were involved in the investigation of the West Shawmut drug conspiracy.

The court has considered the testimony of these witnesses, as well as both parties' briefs and oral arguments.  In addition, it has reviewed the trial, sentencing and re-sentencing transcripts for Trammell. Upon evaluation of these materials, the court now makes the following findings.

## II. Findings

### A. Drug Quantity [11]

Calculating the base offense level for a defendant convicted of drug conspiracy and distribution requires an assessment of the quantity of illegal drugs attributable to that defendant.[12]  U.S.S.G. § 2D1.1(a)(3) & (c).  If in dispute, the government bears the burden of proving the drug quantity attributable to a defendant by a preponderance of the evidence.  United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005).  Application note 12 of the Commentary to U.S.S.G. § 2D1.1 states that "[w]here there is

_____

11.  This issue is legally identical to the drug-quantity issue for the four co-defendants this court resentenced in 2000.  Therefore, the court will once again rely heavily on its previous order in its explication of the governing rules and standards with respect to drug quantity.

12.  Pursuant to U.S.S.G. § 3D1.2, "all counts involving substantially the same harm shall be grouped together into a single Group."  Such is the case here with Counts 1 (conspiracy) and 24 (distribution).  Thus, the court need only determine one drug quantity amount attributable to Trammell for the purpose of calculating his sentences under the Guidelines for both the distribution and conspiracy counts.

no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."  In addition, the application note expressly notes that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level," and refers the reader to U.S.S.G. § 1B1.3, the provision of the Guidelines addressing "Relevant Conduct."

Section 1B1.3 provides that a defendant's base offense level accounts for "all acts and omissions committed, aided, abetted, counseled ... or willfully caused by the defendant," as well as, "in the case of a jointly undertaken criminal activity, ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" that occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1)(A) & (B).

Complementing subsection 1B1.3(a)(1) is subsection 1B1.3(a)(2), which specifically refers to offenses like Trammell's convictions for drug conspiracy and distribution, which are grouped pursuant to U.S.S.G. § 3D1.2(d) for the purpose of determining a single base offense level.  This subsection reinforces that the base offense level for such counts must include consideration of "all acts or omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).

Application note 2 of the Commentary to § 1B1.3 provides that in order to determine the quantity of drugs attributable to a particular defendant involved in a conspiracy, a district court must engage in a two-step process.  The court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake."  U.S.S.G. § 1B1.3, n. 2; <u>see also United States v. Ismond</u>, 993 F.2d 1498, 1499 (11th Cir. 1993).  Application note 2 specifies that the scope of this activity

12

"is not necessarily the same as the scope of the entire conspiracy." <u>Id</u>.  Second, once the extent of a defendant's participation in the conspiracy is established, "the court can determine the drug quantities reasonably foreseeable in connection with that level of participation."  993 F.2d at 1499.

Thus, in sum, the Guidelines require a district court to "attribute to a defendant all drugs foreseeably distributed pursuant to a common scheme of which that defendant's offense of conviction was a part." <u>United States v. Butler</u>, 41 F.3d 1435, 1443 (11th Cir. 1995); <u>see</u> <u>also</u> <u>United States v. Andrews</u>, 953 F.2d 1312, 1319 (11th Cir. 1992).  This does not mean, however, that a defendant will be responsible for all of the drugs attributed to the entire conspiracy.

i. Scope of Trammell's participation

For several reasons, the scope of Trammell's participation in the West Shawmut drug conspiracy is

13

exceedingly difficult for the court to determine based on
the evidence and testimony available.

    First, unlike the co-defendants in this case who were
previously resentenced by the court, very limited testimony
regarding Trammell's precise role in the conspiracy was
presented at trial.  Although the government suggested in
its opening statement that Trammell ranked very highly in
the West Shawmut hierarchy, the evidence with respect to the
frequency and extent of his actual involvement in the
conspiracy was limited.[13]  In fact, the court could only find
two references to specific drug transactions involving

_____

    13.  In his opening statement, the Assistant United
States Attorney remarked,

> "And then you are going to hear about the
> level four guys that didn't hang out.
> Individuals like Stan Quincey Johnson ...
> He didn't sell small rocks of crack
> cocaine, he sold weight to level two and
> three guys so that they could go out and
> give the crack cocaine to the level one
> guys ... Johnson is not the only one who
> falls into level four ... Mr. Trammell
> didn't hang out out there, he sold his
> dope knowing it was going to West Shawut."

Trial transcript, March 28, 1994, pp. 22-23.

Trammell at trial, both of which were conducted with confidential informant Nichael Welch, and both of which involved relatively modest amounts of crack cocaine.

The first transaction took place on July 20, 1993. Welch testified that he was instructed by agents to purchase crack cocaine from Trammell and that he enlisted the help of co-defendant Donald Lancaster, a level-one "runner," to do so.[14] Welch's testimony, as well as the transcript of the tape recording of the incident, indicates that Lancaster attempted to discourage Welch from buying crack from Trammell, and instead suggested that Welch make a purchase from co-defendant JaJa Davis.[15] Welch testified that despite Lancaster's urging otherwise, the two of them initially went to Trammell's house, but he was not home.  After driving around for a while, Welch indicated that the pair later returned to Trammell's house for a second time and found Trammell at home.  Welch further explained that Trammell

---

14.  Trial transcript, April 5, 1994, p. 7.

15.  Govt. Ex. 55-18-2, p. 1.

15

told him, "when I come out there [to purchase drugs], [I should] come by myself because Lancaster been wanting too much [cocaine as payment for his services as a runner]."[16] In fact, Welch testified that although he purchased a quarter of an ounce of crack from Trammell that day, Trammell refused to give Lancaster any commission for bringing him Welch's business.[17]

Welch's testimony about this incident suggests little about the scope of Trammell's involvement in the conspiracy. At most, Welch's testimony indicates that Trammell sold a modest quantity of drugs from his home,[18] that he had a contentious, on-and-off relationship with one of the level-one runners involved in the conspiracy, and that he

---

16.   Trial transcript, April 5, 1994, p. 23.

17.   Trial transcript, April 5, 1994, p. 24.   Lab analysis results introduced at trial indicated that the substance he purchased from Trammell weighed 4.544 grams. Govt. Ex. 57-18-4.

18.   The government suggested that, as an upper-level distributor, Trammell dealt only in quantities of an ounce or more of crack cocaine.   This transaction indicates that in fact, he sold smaller quantities of crack directly to customers.

apparently preferred to bypass certain "runners" in the
conspiracy so as to avoid paying them commission, and
encouraged customers to contact him directly when they
wished to purchase crack.  Welch's testimony about the crack
purchase of July 20, 1993, provides no indication as to
which members of the conspiracy Trammell dealt with, how
frequently he sold or otherwise supplied crack, how often he
employed the services of the runners, or the extent to which
he knew about or agreed to be a part of the larger drug
conspiracy in the West Shawmut community.

It appears from Welch's testimony that he abided by
Trammell's wishes and contacted Trammell directly when he
made his second purchase of crack cocaine from him on
September 22, 1993.  Welch indicated at trial that the only
people present during that second transaction were himself,
a man named Henry, who was not charged as part of the
conspiracy, and Trammell.  On that occasion, according to

17

Welch, he again purchased a "quarter" of an ounce of crack cocaine from Trammell.[19]

Welch's second purchase from Trammell is even less telling with respect to the scope of Trammell's involvement in the conspiracy than his first.   Aside from "Henry," a person who has never been implicated in the conspiracy, Welch was alone when he made the purchase from Trammell. None of the other members of the conspiracy are mentioned during the conversation recorded by Welch during the transaction.   Thus, the September 22, 1993, transaction is equally unhelpful to the court in determining the scope of Trammell's involvement in the conspiracy.

The parties have directed the court to only one additional, relevant reference to Trammell in Welch's testimony.   Welch admitted on cross-examination that on January 21 and 25, 1994, he approached Trammell, defendant Algie Shealey, and defendant Johnson and told them that he

_____

19.   Id. at 101.   A lab report introduced at trial containing an analysis of the substance purchased from Trammell on September 22, 1993, established that the drugs weighed 4.712 grams.   Govt. Ex. 78-24-4.

would soon bring them a large sum of money to buy two ounces of crack cocaine.[20]  This reference is helpful to the court to the extent that it associates Trammell with two of the upper-level dealers in the conspiracy.  However, Welch did not provide any further details regarding the nature of the association between these three men or how much crack cocaine each individual man agreed to supply.  He also admitted that although it was discussed, the proposed transaction never took place.[21]

Other witnesses' trial testimony is equally vague and unhelpful with respect to Trammell's role in the conspiracy.  For example, the testimony of cooperating co-conspirator Eltin Billingsley, a level-one runner, contains just one fleeting reference to Trammell.  When asked, "What, if anything, did you see James Trammell do during the summer of 1993?," Billingsley responded, "Nothing, really.  I used to see James just riding through.  Just riding through the

_____

20.   Trial transcript, April 6, 1994, p. 222.

21.   Id.

19

neighborhood.  Just hanging out."[22]  The most the court can glean from this testimony is that, to the extent Trammell employed level-one runners, he did not work directly with Billingsley.

Aside from the testimony at trial, the government presented little additional testimony and evidence at Trammell's resentencing hearing on January 31, 2005, that is helpful to the court in determining the scope of Trammell's involvement in the conspiracy.

The government's chief witness against Trammell, co-defendant Johnson, testified that Trammell regularly supplied him with drugs beginning in late 1989 or early 1990, starting approximately one year after Johnson's marriage in September 1988.[23]  He further testified that this business arrangement ended after approximately 18 months, when he and Trammell suffered a falling out due to a dispute

---

22.  Trial transcript, April 7, 1994, p. 83.

23.  Resentencing transcript, January 31, 2005, pp. 30, 34.

involving Trammell's girlfriend and Johnson's wife.[24]

Regardless of whether Trammell began supplying drugs to Johnson in late 1989 or early 1990, it is clear from Johnson's testimony that their business relationship lasted for a year and a half at most and therefore ended prior to the start of the conspiracy, on or about January 1, 1992, as alleged in the superceding indictment.[25]   Furthermore, Johnson provided no indication that this arrangement was

---

24.   Id. at 34.

25.   The superceding indictment (Doc. No. 174A) alleges that the conspiracy began on or about January 1, 1992 and continued through February 4, 1994. It is well-settled that when the government charges that an offense occurred "on or about" a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment, United States v. Creamer, 721 F.2d 342 (11th Cir. 1983); however, proof of a date reasonably near the specified date is required. United States v. Champion, 813 F.2d 1154 (11th Cir. 1987). Furthermore, at no time during the trial did the government make any argument or present any evidence indicating that the conspiracy actually began two to three years earlier than the date alleged in the superceding indictment. Trammell therefore had no opportunity to respond to that argument at trial, and the government cannot now, eleven years after the trial, make such an argument for the first time.

anything more than a private agreement with Trammell or was in any way linked to the broader conspiracy.

The government did question Johnson about the hierarchy of the West Shawmut conspiracy that arose after he and Trammell had their falling out. Johnson indicated that the conspiracy consisted of a multi-level hierarchy consisting of runners and dealers. When asked who the runners got drugs from, Johnson responded, "They come and get them from the dealer."[26] When asked who those dealers were, he responded, "I was one of them. ... Mr. Trammell, JaJa [Davis], and [Timothy] Walker." He provided no further specific information about the hierarchy or drug distribution network in West Shawmut.

He was then asked to describe what he observed about Trammell's activities in the neighborhood during the period of the conspiracy itself, after the pair had their falling out.[27] Johnson responded, "I seen him out in the

---

26. Resentencing transcript, January 31, 2005, p. 35.

27. Id. at 39.

neighborhood, you know, passing by."   Mr. Johnson was then

specifically asked, "In terms of the runners that were there

in Newts parking lot and over in the Hole, did you observe

Mr. Trammell use those runners to help him sell dope?"   He

responded, "I would see one or two come to him down by the

house ... come down there and get some [crack] and run up

back up the road with it."[28]

At best, Johnson's response indicates that Trammell was

a level-two dealer who supplied drugs to and employed the

services of runners.   However, Johnson's testimony provides

the court with little detail about specific breadth and

nature of Trammell's involvement so that "the court can

determine the drug quantities reasonably foreseeable in

connection with [Trammell's] level of participation."

United States v. Ismond, 993 F.2d 1498, 1499 (11th Cir.

1993).

In other words, while the court is convinced that

Trammell dealt drugs from his home with some regularity and

───────────────

28.   Id.

23

was at least a tangential part of the West Shawmut drug conspiracy, the court is unable to reach any additional, specific conclusions with respect to the <u>scope</u>, including the depth and breadth, of Trammell's involvement in the conspiracy itself. No evidence was introduced indicating when Trammell joined the conspiracy, how often he dealt with other members of the conspiracy during the period of the conspiracy, or how frequently he engaged in drug transactions.

If anything, the testimony of the other defendants involved in the conspiracy indicates that Trammell sometimes kept his distance from other members of the conspiracy. Although he was often seen out in the neighborhood, he seemed to dislike dealing with runners, encouraging at least one customer, Welch, to contact him directly to purchase drugs. Furthermore, he suffered a falling out with Johnson, one of the major and most well-known dealers in the conspiracy, prior to the date the conspiracy commenced.

**24**

Finally, as noted above, the superceding indictment alleges that the conspiracy began on or about January 1, 1992, and continued through February 4, 1994.[29]   The Presentence Investigation Report prepared by the United States Probation Office indicates that Trammell was incarcerated from April 6, 1992 through April 7, 1993.[30] Thus, Trammell was incarcerated for a full year in the middle of the two-year conspiracy of which he was convicted. Based on the scant evidence available, the court cannot determine whether Trammell was a member of the conspiracy before he went to prison, or whether he joined the conspiracy at some point after his release.

In sum, after examining the evidence as a whole, the court is persuaded that Trammell was at least a level-two dealer who sold modest quantities of crack cocaine from his home, and who occasionally used the services of runners and

---

29. Superceding indictment (Doc. No. 174A).

30. Presentence investigation report, ¶ 71 (indicating that Trammell was convicted on drug conspiracy charges in Chambers County, Alabama, and was sentenced to a term of imprisonment of one year and one day on April 6, 1992).

25

other members of the conspiracy.  In addition, the court's
conservative estimate is that Trammell was a member of the
conspiracy for at least the last six months of its duration,
assuming he joined the conspiracy no later than July 20,
1993, the first date on which the evidence definitively
links him to the conspiracy by establishing that he
conducted a drug transaction.

### ii. Reasonably foreseeable drug quantities

Because the court has only a limited understanding of
the scope of Trammell's involvement in the conspiracy, it
cannot determine with any certainty the amount of drugs
Trammell could "reasonably foresee" other members of the
conspiracy distributing.[31]  Where a drug amount is uncertain,
courts are urged "to err on the side of caution and only

---

31.  This is especially true given that the court cannot
determine whether Trammell joined the conspiracy before or
after he went to prison. Application Note 2 of the
Commentary to § 1B1.3 specifically states that a defendant's
relevant conduct "does not include the conduct of members of
a conspiracy prior to the defendant joining the conspiracy,
even if the defendant knows of that conduct."

hold the defendant responsible for that quantity of drugs for which [he] is more likely than not <u>actually</u> responsible." <u>United States v. Meacham</u>, 27 F.3d 214, 216 (6th Cir. 1994) (emphasis added). Therefore, the court will consider only drug quantities that can be directly linked to Trammell himself during the conspiracy in arriving at a total drug amount for sentencing purposes. <u>See</u>, <u>e.g.</u>, <u>United States v. Beasley</u>, 2 F.3d 1551, 1561-62) (11th Cir. 1993) (where defendant's scope of involvement in drug conspiracy was unclear, district court erred in holding him responsible for drug quantity attributable to entire conspiracy; record must support the specific amount of drugs attributable to the individual defendant); <u>United States v. Milledge</u>, 109 F.3d 312 (6th Cir. 1997) (vacating and remanding defendant's sentence for drug conspiracy where district court attributed drug quantity to defendant that far exceeded his scope and personal involvement in the conspiracy based on the available evidence). With that in mind, the court considers three key pieces of evidence.

27

### a. Welch's testimony at trial

As noted above, Welch testified that he purchased crack cocaine from Trammell on two separate occasions: 4.544 grams on July 20, 1993 (as alleged in Count 18 of the superceding indictment), and 4.712 grams on September 22, 1993 (as alleged in Count 24 of the superceding indictment). Although Trammell was not convicted of conducting the July 1993 sale, the court finds Welch's testimony credible, and is persuaded by at least a preponderance of the evidence that Trammell conducted that transaction. <u>See</u> <u>United States v. Watts</u>, 519 U.S. 148, 156, 117 S.Ct. 633, 637 (1997) (sentencing court may consider conduct of which defendant has been acquitted, so long as that conduct has been proved by a preponderance of the evidence).[32] In addition, the jury

───────────────────

32. Because the standard of proof for sentencing purposes is much lower, and because the evidence against Trammell was fairly overwhelming, the court feels confident in reaching this conclusion despite the fact that it makes this finding based on a review of the cold record, and without the benefit of having heard the testimony and evidence at Trammell's original trial. Pursuant to Fed.R. Crim.P. 25, the undersigned certifies complete familiarity with Trammell's trial record.

28

found beyond a reasonable doubt that Trammell conducted the September 1993 transaction; the court is likewise persuaded. Therefore, the court finds Trammell accountable for these 9.256 grams of crack cocaine.

### b. Substances seized on January 28, 1994

The court also acknowledges that ATF Agent Michael Dixon testified at the resentencing hearing about a search warrant he executed at Trammell's residence on January 28, 1994. The warrant resulted in the confiscation of, among other things, "one paper with crack cocaine and two plastic bags containing crack cocaine."[33] However, after examining the exhibits introduced into evidence at trial and resentencing, the court is unable to locate any lab results confirming that these seized substances contained crack cocaine or the weights of these substances.[34]

_____

33. Resentencing transcript, January 31, 2005, p. 64-5. See also Govt. Ex. 1, "Confiscated Item/Search Warrant Inventory."

34. At the resentencing hearing, Dixon himself was
(continued...)

"Although sentencing may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant, sentencing cannot be based on calculations of drug quantities that are merely speculative." United State v. Zapata 139 F.3d 1355, 1359 (11th Cir. 1998) (quoting United States v. Brazel, 102 F.3d 1120, 1159 n. 32 & 33 (11th Cir. 1997)). Given the absence of any lab results confirming the nature and weight of the substances seized from Trammell's home, as well as the lack of specific testimony regarding the quantity of drugs seized, the court is unable to determine the quantity of drugs found in Trammell's home on January 28, 1994. The court cannot engage in pure speculation as to the quantity of drugs

_____

34.  (...continued)

unable to provide any information as to the weights of the various substances recovered. He testified on direct, "Yes, sir.  There were drugs found.  There was cocaine found during that [search].  I don't know the exact amounts." Resentencing transcript, January 31, 2005, p. 64.

Likewise, the inventory list introduced into evidence at the resentencing hearing simply states that "1 paper w/ crack cocaine - scales," was recovered, along with "2 plastic bags w/ crack cocaine - razor blades." Govt. Ex. 1.

seized that day, and will therefore not include the
substances seized on January 1994 in its computation of the
drug quantity attributable to Trammell for sentencing
purposes.[35]


### c. Stanley Johnson's testimony

As noted above, the government's chief witness at the
resentencing hearing was co-defendant Johnson.  At the
hearing, Johnson testified that his drug dealing
relationship with Trammell began in either late 1989 or
early 1990, approximately one year after he got married in
September 1988.[36]  Johnson testified that he first approached
Trammell about dealing drugs when he encountered financial

_____

35.  The court's conclusion that it is inappropriate to
speculate as to this drug quantity is bolstered by the fact
that the government has not argued in any of its briefs that
the court should consider the weight of the substances
seized from Trammell's home on January 28, 1994 in
determining the quantity of drugs attributable to him.

36.  When the government asked Johnson how long after
his marriage he first approached Trammell about the drug
business, Johnson responded, "About in '89 or '90. Probably
a year after I got married."  Resentencing transcript,
January 31, 2005, p. 30.

problems, and that Trammell taught him how to "cook up" cocaine powder into crack cocaine and how to "break down" the crack into varying amounts to sell.[37]   He further testified that Trammell supplied him with approximately an ounce of crack cocaine per week, which Johnson in turn resold to customers, for a period of approximately 18 months.[38]   However, as noted above, Johnson also testified that his business relationship with Trammell ended after he and Trammell had a falling out over an incident involving Trammell's girlfriend and Johnson's wife.  At that time, Johnson testified, he found a new source to supply him with crack cocaine.[39]   Furthermore, as noted above, at no point in his testimony did Johnson indicate that the arrangement he had with Trammell for those 18 months was related to the conspiracy that began in 1992 or that any of the other co-

---

37.  Id. at 31.

38.  When asked how long this arrangement continued for, Johnson responded, "Over a year.  About a year and a half, something like that."  Id. at 34.

39.  Id. at 38.

defendants in this case were involved in this particular arrangement.

Although Johnson was clear in his testimony that his relationship with Trammell began in late 1989 or early 1990 and continued for approximately 18 months, he also testified on direct examination that his relationship ended in 1992. However, on cross-examination, he resolved any date discrepancies and confirmed that he began dealing with Trammell in 1989 or 1990, and stopped dealing with him in 1991. When asked if he was sure about the date his involvement with Trammell ceased, he reiterated that their business relationship ended some time in 1991.[40]

_____

40.   On cross-examination, the following exchange occurred:

> "Q: My question was, when did you stop dealing with Mr. Trammell as it regards narcotics?
>
> "A: After we had the confrontation about his girlfriend telling my wife some stuff.
>
> "Q: When was that?
>
> "A: Like in '91.

(continued...)

Based on Johnson's testimony on direct and cross-examination, the court concludes that the 18-month period during which Trammell supplied Johnson with an ounce of crack cocaine per week ended some time in 1991, _prior_ to the start of the conspiracy in 1992. Thus, the quantity of drugs Trammell supplied to Johnson during this 18-month period is outside the scope of the conspiracy and is not attributable to Trammell for resentencing purposes.[41]

_____

40. (...continued)
"Q: Are you sure about that?  Can you tell me what time of year it was?

"A: I'm just — You know, I can't give you an exact date.  You know, you're talking about eleven, twelve years ago.  I know it was like in '89 or '90.  '91.  Somewhere in there.

"Q: But you can't pin it down any closer than that?

"A: I'd say it was close to '91."

_Id_. at 44.

41. In its supplemental brief regarding resentencing, the government argues that the court should include the "1,872 grams which Stanley Quincey Johnson said he purchased directly from Trammell on a weekly basis for approximately
(continued...)

34

In sum, based on its limited understanding of the scope of Trammell's participation in the conspiracy as well as the paucity of evidence in the record directly linking Trammell to specific drug amounts, the court concludes that Trammell can be held accountable for 9.256 grams of cocaine for sentencing purposes.  Trammell's position in the hierarchy of the conspiracy suggests that he is responsible for a quantity of drugs greater than 9.256 grams.  However, sentencing must be based on "fair, accurate and conservative estimates of the quantity of drugs attributable to a defendant."  Rodriquez, 398 F.3d at 1296.  Without more information, 9.256 grams is the fairest, most accurate, and

---

41.  (...continued)
18 months."  Supplement to government's memorandum (Doc. No. 1005), p. 3.  The government admits that "Trammell's sales of cocaine to Johnson began well outside of the indictment period," but argues that "they continued uninterrupted until some time after January 1, 1992, and should therefore be used to calculate his sentence."  Id. at 4.  Because the court disagrees, and finds that Johnson's business relationship with Trammell ended in 1991, it does not accept the government's argument.  The court simply cannot attribute this 1,872 grams of crack to Trammell when it is clear that he ceased supplying drugs to Johnson well before the commencement of the conspiracy at issue here.  See U.S.S.G. § 1B1.3, Commentary, Note 2.

most conservative estimate of the quantity of drugs attributable to Trammell the court can make.


## B. Firearm Enhancement

Trammell objects to the addition of a two-level enhancement to his base offense level due to possession of a dangerous weapon.  Section 2D1.1(b)(1) of the Sentencing Guidelines states that a defendant's base offense level is increased by two levels "if a dangerous weapon (including a firearm) was possessed."  Application note 3 in the Commentary to § 2D1.1 indicates that "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons.  The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

At Trammell's original sentencing, the court imposed this two-level enhancement based on the fact that one of Trammell's co-defendants and conspirators, Ossie O. McCauley

III, possessed and used a firearm in furtherance of the drug conspiracy on May 20, 1993. Specifically, testimony indicated that on that date, McCauley placed a gun to a confidential informant's head and threatened to kill him, after he learned from another co-conspirator that the informant had been assisting the police in making a controlled buy of crack cocaine.[42] Trammell argues that he cannot be held responsible for this incident because he himself was not present at the time, and because there was no testimony at trial specifically linking him to McCauley.[43]

The Eleventh Circuit Court of Appeals has held that sentence enhancement for a co-conspirator's firearms possession is appropriate if four conditions are proved by a preponderance of the evidence: "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in

_____

42. Recommendation of magistrate judge, 01cv658, (Doc. No. 47) p. 11. See also testimony of Robert Chambers & Darryl Armor, resentencing transcript, January 31, 2005, pp. 55 & 60.

43. Defendant's resentencing brief (Doc. No. 996), p. 8.

furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant." United States v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999).

While the court finds the first two conditions easily satisfied by a preponderance of the evidence, it is unclear whether Trammell was a member of the conspiracy on May 20, 1993. As noted above, Trammell was incarcerated from April 6, 1992 until April 7, 1993. The first drug transaction specifically linking Trammell to the conspiracy took place on July 20, 1993. Therefore, the court previously concluded that Trammell joined the conspiracy no later than July 20, 1993. Because there is nothing in the record to suggest that Trammell had already joined the conspiracy by May 20, 1993, the court cannot conclude by a preponderance of the evidence that Trammell was a member of the conspiracy at that time. Therefore, he cannot be held responsible for McCauley's possession of a firearm on that date.

However, the May 20, 1993, incident is not the only evidence in the record indicating that numerous firearms were possessed and used in connection with the West Shawmut drug conspiracy. For example, co-conspirator Billingsley testified at trial that, during the summer of 1993 in the "Hole" and the "Dope Zone," he saw Fears with a .38 derringer; McCauley with a nine millimeter handgun and pistol-grip shotgun; and Davis with a nine millimeter handgun, which he utilized in one incident to shoot at a purchaser who attempted to take Davis's drugs without paying for them.[44] Furthermore, law enforcement agent Michael Dixon testified at trial that McCauley was in possession of an assault rifle in his bedroom when he was arrested on January 28, 1994, the same day Trammell was arrested.[45]

At a minimum, Trammell is subject to the two-level firearm enhancement as a result of McCauley's possession of the firearm at the time of his arrest on January 28, 1994.

_____

44. Trial transcript, April 7, 1994, pp. 91-93.

45. Trial transcript, March 30, 1994, pp. 38-39.

At that time, there is no question that McCauley was Trammell's co-conspirator. Furthermore, the presence of the weapon at McCauley's home is sufficient evidence that his possession of it was in furtherance of the conspiracy. <u>See</u> <u>United States v. Hall</u>, 46 F.3d 62, 64 (11th Cir. 1995) (handgun seized from dresser drawer of bedroom in house where drug activity took place justified two-level enhancement for possession of dangerous weapon). This is especially true given that McCauley was a level-two crack dealer who was known for brandishing weapons in drug distribution zones. Thus, it is not "clearly improbable" that McCauley's possession of the firearm in his home was connected to his drug trafficking activity. <u>See</u> Commentary to § 2D1.1, Application Note 3 ("The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense").

Furthermore, there is no question that Trammell was a member of the conspiracy at the time the weapon was found in McCauley's home. Finally, the Eleventh Circuit has held

**40**

that "an act is reasonably foreseeable if it is 'a necessary or natural consequence of the unlawful agreement.'" <u>United States v. Cover</u>, 199 F.3d 1270, 1275 (11th Cir. 2000).  Co-conspirator possession of firearms is a natural consequence of narcotics conspiracies because "[i]t is uniformly recognized that weapons are often as much 'tools of the trade' as the most commonly recognized narcotics paraphernalia." <u>United States v. Terzado-Madruga</u>, 897 F.2d 1099, 1119 (11th Cir. 1990).  Given the ample testimony that weapons were used in furtherance of this conspiracy on a regular basis, the court has no difficulty concluding by a preponderance of the evidence that the possession of a firearm by McCauley was reasonably foreseeable to Trammell.[46]

---

46.  Because the court finds Trammell eligible for the firearm enhancement due to McCauley's possession of a firearm at the time of his arrest, it need not determine whether he is also eligible for the enhancement as a result of his own possession of firearms.  The court also need not determine whether Billingsley's testimony that he saw several members of the conspiracy carrying firearms during the summer of 1993 is sufficient to trigger the application of the firearm enhancement to Trammell's sentence.

## C. Supervisory Role Enhancement

Trammell also objects to the government's pursuit of an additional enhancement to his base offense level for his role as a "manager" or "supervisor" in the drug conspiracy. According to U.S.S.G. § 3B1.1(b), a defendant is subject to a three-level increase if he "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." That the conspiracy at issue involved more than five participants is undisputed. However, Trammell contends that there is no evidence to suggest that he played a leadership role in the conspiracy.[47] The government argues that Trammell assumed a supervisory role in the conspiracy because he "sold cocaine base to persons brought to his home by street runners, and to those persons whom he directed to come to his home without an escort."[48]

---

47. Defendant's resentencing brief (Doc. No. 996) p. 8.

48. Supplement to government's sentencing memorandum (Doc. No. 1005), p. 6.

In <u>United States v. Matthews</u>, 168 F.3d 1234 (11th Cir. 1999), the Eleventh Circuit held that "the management enhancement [under § 3B1.1(b)] is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy." <u>Id</u>. at 1249-50 (citing <u>United States v. Stanley</u>, 24 F.3d 1314, 1323 (11th Cir. 1994); <u>United States v. Clavis</u>, 956 F.2d 1079, 1096 (11th Cir. 1992)). In justifying this enhancement for the defendant in that case, the <u>Matthews</u> court relied upon the following evidence:

> "Matthews does not dispute that the evidence at trial established that he fronted or directly sold cocaine to numerous 'runners' who would then sell the drug to buyers along Ebenezer road, giving Matthews the resulting profit.... In exchange for this service the runners would generally be entitled to a small amount of cocaine for their own personal use. This undisputed activity was sufficient to justify the sentencing court's enhancement under § 3B1.1(b)."

<u>Id</u>. at 1250.

In Trammell's case, there is ample evidence in the record that he employed the services of runners on at least

**43**

a few occasions.   Although he refused to pay Lancaster a

commission for the July 20, 1993 sale, Welch's testimony

that Trammell told him, "when I come out there [to purchase

drugs], [I should] come by myself because Lancaster been

wanting too much [cocaine as payment for his services as a

runner]," indicates that Trammell had used Lancaster's

services as a runner in the past.[49]   Furthermore, Johnson

testified at the resentencing hearing that "I would see one

or two [runners] come to [Trammell] down by the house ...

come down there and get some [crack] and run up back up the

road with it."[50]   Finally, Johnson also testified that

Trammell was a dealer at the same level as himself, JaJa

Davis, and Timothy Walker.[51]

The court finds this testimony credible.   Although, as

noted earlier, it is difficult to determine the precise

scope of Trammell's involvement in the conspiracy, it is

_____

49.   Trial transcript, April 5, 1994, p. 23.

50.   Resentencing transcript, January 31, 2005, p. 39.

51.   Id. at 35.

**44**

readily apparent to the court that Trammell was at least a level-two dealer in the conspiracy who occasionally employed the services of runners.  Pursuant to <u>Matthews</u>, the court thus concludes that Trammell is subject to the three-level enhancement for his supervisory or managerial role pursuant to U.S.S.G. § 3B1.1(b).


   D. Imposition of Consecutive or Concurrent Sentences

     In its original resentencing brief, the government argued that, pursuant to U.S.S.G. § 5G1.2(d), the court should impose consecutive sentences on the various counts of conviction.  However, this argument was based on the government's own calculation of the drug quantity attributable to Trammell, which the court has now rejected.  Thus, the government's argument is moot.


              i. The government's argument

     The government contended that Trammell should be held accountable for at least 1.5 kilograms of cocaine, resulting

45

in a base offense level of 38, and an adjusted base offense level of 43.[52]  Combined with a criminal history category of III, the government concluded that Trammell's guideline range was life imprisonment.  However, it conceded that the statutory maximum as to Count I, a Class B felony, is 5 to 40 years pursuant to 21 U.S.C.A. § 841(b)(1)(B), and that the statutory maximum as to Count 24, a Class C felony, is not more than 20 years, pursuant to 21 U.S.C.A. § 841(b)(1)(C).  Because Trammell's guideline sentencing range as proposed by the government exceeded the statutory maximum on both counts, the government argued that § 5G1.2(d) mandated the imposition of consecutive sentences. Section 5G1.2(d) reads,

> "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total

_____

52.  The government added two levels for possession of a firearm, pursuant to § 2D1.1(b)(1), as well as the three-level enhancement for a managerial or supervisory role in the offense pursuant to § 3B1.1(b).

punishment.    In  all  other  respects,
sentences   on   all   counts   shall   run
concurrently,  except  to  the  extent
otherwise required by law."


### ii. The court's calculation

Trammell's  drug  conspiracy  and  distribution  offenses
(Counts  1  and  24)  are  grouped  together,  pursuant  to
§  3D1.2(d)  ("Group  I").[53]    In  addition,  his  firearms
convictions  (Counts  2-4)  are  also  grouped  together  for  the
purpose  of  determining  a  base  offense  level  ("Group  II").

The  court  has  now  determined  that  9.256  grams  of  crack
cocaine  are  attributable  to  Trammell  for  sentencing
purposes.    This  results  in  a  base  offense  level  of  26,
pursuant  to  §  2D1.1(c)(7).    In  addition,  the  court  found
above  that  Trammell  is  subject  to  a  two-level  firearm
enhancement,  pursuant  to  §  2D1.1(b)(1),  and  a  three-level
enhancement  for  his  supervisory  or  managerial  role  in  the
offense,  pursuant  to  §  3B1.1(b),  for  a  total  base  offense
level  of  31  for  Group  I.

---

53.  <u>See supra</u> note 12.

47

Trammell's base offense level for Group II, as determined at his original sentencing, is 20, and remains undisturbed by this court.[54] An application of the multiple count adjustment rules to Groups I and II of Trammell's convictions results in a combined adjusted offense level of 31, pursuant to § 3D1.4.  The guideline range for an offense level of 31 and a criminal history category of III is 135 to 168 months, or 11 years and three months to 14 years. Because this guideline range is less than the statutory maximum on both Counts 1 and 24, § 5G1.2(d) provides that the sentences on all counts shall run concurrently.

## III. Conclusion

For the reasons above, the court concludes, for the purposes of calculating Trammell's sentence under the Sentencing Guidelines, that:

(1) The amount of drugs attributable to Trammell for sentencing purposes is 9.256 grams of cocaine base;

---

54.  Memorandum of Probation Officer on Resentencing (Doc. No. 975) p. 5.

(2) Trammell is subject to a two-level enhancement to his base offense level for firearm possession, pursuant to § 2D1.1(b)(1);

(3) Trammell is also subject to a three-level increase in his base offense level for his supervisory or managerial role, pursuant to § 3B1.1(b); and

(4) Pursuant to § 5G1.2(d), the sentences on all counts shall run concurrently.

Finally, while the court has indicated that Trammell's Sentencing Guidelines range is 135 to 168 months, the Guidelines are merely advisory pursuant to <u>United States v. Booker</u>, 543 U.S. ___, 125 S. Ct. 738 (2004). Therefore, the parties should be prepared to address whether the court should impose a sentence greater than the Guidelines range because Trammell's supervisory role in the conspiracy suggests that he is responsible for a quantity of drugs greater than 9.256 grams of crack cocaine.

It is therefore ORDERED that defendant James Lee Trammell, Jr. shall be resentenced in accordance with the findings set forth in this order.

DONE, this the 26th day of August, 2005.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE